JAMES T. HANNINK (131747)
jhannink@sdlaw.com
ZACH P. DOSTART (255071)
zdostart@sdlaw.com
DOSTART HANNINK & COVENEY LLP
4180 La Jolla Village Drive, Suite 530
La Jolla, California 92037-1474
Tel: 858-623-4200
Fax: 858-623-4299

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SHANNON DALE PRICE and CHERYL EDGEMON, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

SYNAPSE GROUP, INC., a Delaware corporation; SYNAPSECONNECT, INC., a Delaware corporation; TIME INC., a Delaware corporation; and DOES 1-50, inclusive,

Defendants.

CASE NO. 16-CV-01524-BAS-BLM

**SECOND AMENDED CLASS ACTION COMPLAINT**

**(1) FALSE ADVERTISING;**

**(2) VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT;**

**(3) CONVERSION;**

**(4) UNFAIR COMPETITION;**

**(5) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Plaintiff Shannon Dale Price ("Price") is an individual residing in San Diego County, California. Plaintiff Cheryl Edgemon ("Edgemon") is an individual residing in San Diego County, California. Edgemon and Price are collectively referred to herein as "plaintiffs."

2. Plaintiffs are informed and believe and thereon allege that defendant Synapse Group, Inc. ("Synapse") is a Delaware corporation that does business in San Diego County, including the marketing of magazine subscriptions.

3. Plaintiffs are informed and believe and thereon allege that defendant SynapseConnect, Inc. ("SynapseConnect") is a Delaware corporation that does business in San Diego County, including the marketing of magazine subscriptions.

4. Plaintiffs are informed and believe and thereon allege that defendant Time Inc. ("Time") is a Delaware corporation that does business in San Diego County, including the marketing of magazine subscriptions. Time is a publisher of numerous magazines, including *Time*, *People*, *Sports Illustrated*, *Sunset*, *Fortune*, and others, that it markets to consumers through a variety of channels, including through Synapse and/or SynapseConnect.

5. Plaintiffs are informed and believe and thereon allege that Synapse is a wholly-owned subsidiary of Time; that SynapseConnect is a wholly-owned subsidiary of Synapse; that there is such a unity of interest between these entities that their separateness has ceased; that Time so controls and conducts the affairs of Synapse so as to render Synapse a mere instrumentality, agency, conduit, or adjunct of Time, and that Time and Synapse so control and conduct the affairs of SynapseConnect so as to render SynapseConnect a mere instrumentality, agency, conduit, or adjunct of Time and Synapse; and that disregard of the corporate separateness of Synapse and SynapseConnect is necessary to avoid those entities from being used to circumvent the California Automatic Renewal Law, the

California Consumers Legal Remedies Act, and/or the California Unfair Competition Law or otherwise cause an unjust result.

6. Plaintiffs do not know the names of the defendants sued as DOES 1 through 50 but will amend this complaint when that information becomes known. Plaintiffs allege on information and belief that each of the DOE defendants is affiliated with one or more of the named defendants in some respect and is in some manner responsible for the wrongdoing alleged herein, either as a direct participant, or as the principal, agent, successor, alter ego, or co-conspirator of or with one or more of the other defendants. For ease of reference, plaintiffs will refer to the named defendants and the DOE defendants collectively as "defendants."

7. Venue is proper in this judicial district because the complained of conduct occurred in this judicial district.

## BACKGROUND

8. As explained below, defendants are engaged in an illegal "automatic renewal" scheme for magazine subscriptions. Under the guise of providing consumers the opportunity to obtain magazines either free or at a discounted price for a specific term, defendants actually enroll consumers in a program that automatically renews the subscriptions from year-to-year and results in annual charges to the consumer's credit card, debit card, or third party payment account without providing the requisite disclosures and without obtaining the requisite authorizations required by California law.

9. Traditionally, magazine publishers sold subscriptions on the basis of a schedule that reflects a fixed price for a definite term (such as one, two, or three years). Under that arrangement, the consumer selects the desired price/term combination and submits payment. Later, when the end of the term is approaching, the consumer is notified that the subscription will soon come to an end and is provided with a renewal offer. If the consumer wishes to renew, he or she selects the desired price/term combination for the renewal period and submits the

corresponding payment. Alternatively, if the consumer does not renew, the subscription comes to an end.

10. During the 1990s, some marketers came to view the traditional model as constraint on sales and profits, and advocated instead adoption of a "negative option" model. In a "negative option," the seller "interpret[s] a customer's failure to take affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services." *See "Negative Options,"* Federal Trade Commission, January 2009 (available at https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-trade-commission-workshop-analyzing-negative-option-marketing-report-staff/p064202negativeoptionreport.pdf (last accessed August 23, 2016). One variety of the negative option model is an arrangement in which a magazine subscription will be "automatically renewed" and thus continue indefinitely unless and until the consumer takes affirmative steps to cancel.

11. Within the magazine industry, Synapse was an early advocate of the negative option model. Synapse was formed in 1991 as NewSub Magazine Service LLC by Michael Loeb and Jay Walker. In 1996, Loeb and Walker filed a patent application regarding "open-ended subscriptions." The patent was issued in 2000 as U.S. Patent No. 6,014,641, a copy of which is attached hereto as Exhibit 1. In the '641 patent, Loeb and Walker explained that the traditional subscription model "inherently discourages subscribers from renewing their subscriptions" because it "forces subscribers to periodically reconsider and reevaluate whether the value imparted by the subscriptions justify their expense." Ex. 1 at 16 ('641 Patent at col. 1, lines 65-67). On the other hand, Loeb and Walker also recognized that an automatic renewal model can present the risk of consumer deception: "Subscribers often did not even realize that they had to affirmatively cancel their subscriptions to avoid renewal. This was confusing to unwitting subscribers wishing to discontinue receipt of magazines once their subscription terms had ended." Ex. 1 at 16 ('641

Patent at col. 2, lines 38-42). That appears to have been borne out in experience. It has been reported that by 2003, the Federal Trade Commission (FTC) was receiving 500,000 complaints annually about deceptive magazine sales. *See "Negative Option: When No Means Yes,"* Consumer Affairs, April 2005 (copy attached as Exhibit 2).

12. Time Inc. is—and for many years has been—a major player in the magazine publishing industry. Since its founding in 1922, Time has published the eponymous news magazine, *Time*, as well as many other popular magazines across a variety of categories. Time's current magazine portfolio includes (among others) *People*, *Sports Illustrated*, *Southern Living*, *Real Simple*, *Cooking Light*, *Entertainment Weekly*, *InStyle*, *Money*, *Golf*, *Health*, *Sunset*, *Essence*, *Travel + Leisure*, *Food & Wine*, and *Fortune*.

13. As Time explains in its annual filings with the Securities and Exchange Commission, the company derives revenue primarily from the sale of magazine advertising (half of the company's revenue) and paid circulation (one-third of the company's revenue). *See* excerpts of Form 10-k for year ending December 31, 2015 (Ex. 3 at 35). The number of subscriptions is important not only for the subscription revenue as such, but also because "circulation is an important component in determining our advertising revenues …" Ex. 3 at 35.

14. Based on recent figures, Time's U.S. magazines account for 25.1% of total U.S. advertising revenues generated by all consumer magazines combined. Time publishes seven of the top 25 magazines in terms of U.S. advertising revenue, including *People*, *Sports Illustrated*, and *InStyle*, which rank #1, 3, and 8, respectively. Ex. 3 at 34.

15. Due to the important role of circulation in generating both subscription revenue and advertising revenue, Time has always had a financial interest in maximizing the number and duration of subscriptions. As negative option subscription models gained attention within the industry, Time apparently concluded

that it could also benefit from that strategy. To that end, in June 2000, Time purchased a 20% equity interest in Synapse. According to a Time press release, "The marketing of consumer magazines is undergoing substantial change. Our relationship with Synapse is an important part of Time Inc.'s strategy to support the expansion of new and innovative marketing methods." *See* Press Release, "*Synapse Group Inc. Announces Equity Investment by Time Inc.*," copy attached as Exhibit 4.

16. The following year, in December 2001, Time acquired an additional 60% interest in Synapse for approximately $285 million, bringing its equity ownership to about 80%. *See* Excerpt of Form 10-k for year ending December 31, 2001, Exhibit 5 at 45. From and after December 1, 2001, the financial results of Synapse were included in the consolidated results of Time.

17. Time acquired additional equity interests in Synapse during 2003 ($40 million) and 2004 ($120 million). *See* Excerpt of Form 10-k for year ending December 31, 2003, Exhibit 6 at 54-55. Those acquisitions brought Time's ownership of Synapse up to 92%. *See* Excerpt of Form 10-k for year ending December 31, 2004, Exhibit 7 at 59.

18. Time's 10-k filings reflect that Time utilizes Synapse as one of its distribution channels for magazines. *See, e.g.*, Ex. 8 at 67; Ex. 9 at 75. That arrangement has resulted, and continues to result, in additional subscription revenue and additional advertising revenue for Time.

19. In 2006, the Attorneys General of 23 states conducted an investigation into Time's marketing and billing practices. Among other things, the Attorneys General were concerned about whether the terms of automatic renewal subscription offers made by Time were clearly or adequately provided to consumers; whether customers were given the opportunity to expressly consent to such offers; whether the customers were likely to believe that a purchase was for a limited-term subscription rather than an automatically renewed subscription; and whether customers were subsequently informed of the activation of an automatic renewal

and, if so, in what manner. *See In the Matter of Time Inc.*, Assurance of Voluntary Compliance or Discontinuance ("AVCD"), a copy of which is attached hereto as Exhibit 10 at 78.

20. To resolve the AG investigation, Time agreed to change certain of its business practices regarding automatic renewal subscriptions. Among other things, Time agreed that it would "Clearly and Conspicuously" disclose automatic renewal offer terms and place those disclosures in "immediate proximity" to the area on a form where the customer selects the subscription or billing terms. Ex. 10 at 84. Time also agreed, prior to each automatic renewal period, to provide the customer with a written reminder notice that "Clearly and Conspicuously" informs the customer that he or she is about to be renewed and billed or charged for another subscription term unless he or she cancels, states the price and term of the renewal period, and provides a toll-free telephone number through which the customer can cancel. Ex. 10 at 88-89. Apparently alluding to those requirements, Time's 2006 Form 10-k notes that "[t]he Publishing segment has in recent years made various changes in its circulation practices and consequently faces new challenges in identifying new subscribers and increasing circulation, which could have an adverse impact not only on its circulation revenue but also on its advertising revenue." Ex. 11 at 134. By its terms, the AVCD was binding on Time Inc. and its "wholly owned United States subsidiaries as of the Effective Date of this Assurance, including but not limited to Time Inc. Home Entertainment, Entertainment Weekly Inc., Time Publishing Ventures, Inc., Time Consumer Marketing, Inc., and Time Customer Service, Inc., all of which may conduct some or all of the marketing activities and practices addressed herein." Ex. 10 at 83. On information and belief, the Effective Date of the AVCD was on or about March 17, 2006.

21. In April 2006, Time acquired the remaining 8% of Synapse that it did not already own, making Synapse a wholly-owned subsidiary. *See* Excerpt of Form 10-k for year ending December 31, 2006 (Ex. 11 at 132). Notwithstanding that fact,

on information and belief, Time and Synapse thereafter conducted their business affairs on the premise that the marketing or billing restrictions agreed to by Time in the AVCD did not apply to Synapse and did not apply to the subscriptions for Time publications that were marketed by or through Synapse for Time's benefit.

## THE CALIFORNIA AUTOMATIC RENEWAL LAW

22. In 2009, the California Legislature passed Senate Bill 340, which took effect on December 1, 2010 as Cal. Bus. & Prof. Code § 17600 *et seq*. (the California Automatic Renewal Law). SB 340 was introduced because:

> It has become increasingly common to receive consumer complaints about unwanted charges to his/her credit cards for products or services that the consumer did not explicitly request or know they were agreeing to. Consumers report that they believed they were making a one-time purchase of a product, only to receive continued shipments of the product and charges to their credit card. These unforeseen charges are often the result of agreements enumerated in the "fine print" on an order or advertisement that the consumer responded to.

*See* Exhibit 12.

23. The Assembly Committee on Judiciary provided the following background for the legislation:

> This non-controversial bill, which received a unanimous vote on the Senate floor, seeks to protect consumers from unwittingly consenting to "automatic renewals" of subscription orders or other "continuous service" offers. According to the author and supporters, consumers are often charged for renewal purchases without their consent or knowledge. For example, consumers sometimes find that a magazine subscription renewal appears on a credit card statement even though they never agreed to a renewal.

*See* Exhibit 13.

24. The ARL seeks to ensure that, before there can be a legally-binding automatic renewal or continuous service arrangement, there must first be adequate disclosure of certain terms and conditions and affirmative consent by the consumer. To that end, Cal. Bus. & Prof. Code § 17602(a) makes it unlawful for any business making an automatic renewal offer or a continuous service offer to a consumer in California to do any of the following:

(1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer. For this purpose, "clear and conspicuous" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c). In the case of an audio disclosure, 'clear and conspicuous' means in a volume and cadence sufficient to be readily audible and understandable." *Ibid.*

(2) Charge the consumer's credit or debit card or the consumer's account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms.

(3) Fail to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the offer includes a free trial, the business shall also disclose in the acknowledgment how to cancel and allow the consumer to cancel before the consumer pays for the goods or services.

25. Cal. Bus. & Prof. Code § 17602(b) requires that the acknowledgment specified in § 17602(a)(3) include a toll-free telephone number, electronic mail address, or other mechanism for cancellation.

26. In the case of a material change in the terms of an automatic renewal or continuous service offer that has been accepted, Cal. Bus. & Prof. Code § 17602(c) makes it unlawful to fail to provide the consumer with a clear and conspicuous notice of the material change.

27. Notwithstanding legislative and regulatory efforts, including enactment of the California ARL and similar legislation in other states, "automatically renewed" magazine subscriptions continue to be a perennial source of consumer complaints. On October 15, 2011, the *New York Times* published an article drawing attention to the problem in general, and the role of Synapse in particular. See *"How Did This Become a Commitment?,"* a copy of which is attached as Exhibit 14. The article describes consumer complaints of unauthorized credit card charges arising out of magazine subscriptions that were supposedly "automatically renewed." The risk of consumer fraud or deception has increased as credit card billing has become more widely adopted and as marketers have focused on luring consumers with "free trials" or similar offers that turn into auto-renew charges. *See "Beware of auto-renewals' endless charges: Easy to sign up for, hard to shut off; complaints mount,"* copy attached as Exhibit 15 (available at http://www.creditcards.com/credit-card-news/auto-renewals-endless-charges-complaints-1282.phpf) (last accessed August 23, 2016); *"Buy now, pay forever: Beware negative option plans,"* copy attached as Exhibit 16 (available at http://www.creditcards.com/credit-card-news/negative-option-buy-now-pay-forever-1581.php) (last accessed August 23, 2016). To this day, customer reviews of Synapse posted on the Better Business Bureau website are overwhelmingly negative. Many of the complainants report that their credit cards were charged without the person's consent, for magazine "renewals" that the person did not authorize. *See* http://www.bbb.org/connecticut/business-reviews/magazine-

sales/synapse-group-inc-in-stamford-ct-41000185/customer-reviews#breakdown (last accessed August 22, 2016). From those complaints, as well as from the responsive "comments" posted by a Synapse representative, it is readily apparent that many consumers have fallen victim to a marketing ploy identical or similar to that by which, with respect to plaintiffs Price and Edgemon, defendants turned a supposedly "complimentary reward" into credit card charges for "automatically renewed" magazine subscriptions.

## DEFENDANTS' UNLAWFUL MARKETING

28. In or about February 2014, after plaintiff Price made an online purchase at a retailer and filled out a follow-up survey, defendants presented Price with a "Complimentary $100 Reward" stating that he was entitled to receive a "full year of issues" of "up to 5 complimentary magazines" at a cost of just $2.00 per magazine (for either the magazine itself or "processing"). Price selected two magazines and paid the total cost of $4.00 with his credit card by entering his credit card information.

29. Unbeknownst to Price, defendants enrolled him in a program under which the "subscriptions" would "automatically renew" each year, at a much higher price. The following year, without plaintiff Price's authorization, defendants charged Price's credit card approximately $71—a price increase of about 1,700% — supposedly for renewal of the two magazines Price had selected the previous year in response to the survey's "Complimentary $100 Reward."

30. Based on information recently provided by an employee of one of the magazines, Plaintiff Price is informed and believes and thereon alleges that Exhibit 17 attached hereto is the same as or substantially similar to the "reward" that was presented to him by defendants in or about February 2014. Although plaintiff Price was not aware of it when he selected the two magazines, at the bottom of the selection page (Ex. 17 at 169), above a large red button labeled "Continue," there is a paragraph in tiny print, the second to last sentence of which reads as follows:

> All selections come with automatic renewal features. Click "Continue" for full details.

31. On information and belief, the next page presented to plaintiff Price (as "Step 2") was to enter his delivery information. Ex. 17 at 170.

32. On information and belief, the next page presented to plaintiff Price (as "Step 3") was to enter his credit card information. Ex. 17 at 171. Just above the space for entry of credit card information, in red font, appears the message: "Your Reward Selection is complete." Just below the space for entry of credit card information, under the large heading "Important Reward Details" and above a large red button labeled "Complete," there is a 10-sentence paragraph in small font, of which paragraph the fourth and fifth sentences read:

> After the first term, all selections will continue. Each year, you'll receive a reminder notice specifying price plus processing (and any applicable sales tax) and billing terms for the next term of issues and you authorize the account you provide to be charged the rate on the notice for the next term of issues unless you choose to cancel: 1-800-429-2550.

33. Those sentences are a legal nullity because, as a matter of law, the selection of magazines in response to defendants' "Complimentary $100 Reward" could not give rise to an agreement for automatic renewal or continuous service. That is so for at least the following reasons:

a. Defendants failed to present automatic renewal offer terms or continuous service offer terms in a manner that is "clear and conspicuous" and "in visual proximity" to a request for consent to an offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l);

b. Defendants charged plaintiff's credit card without first obtaining plaintiff's affirmative consent to an agreement containing clear and conspicuous disclosure of automatic renewal offer terms or continuous service offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and

c. Defendants failed to provide an acknowledgment that includes automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that was capable of being retained by plaintiff, in violation of Cal. Bus. & Prof. Code § 17602(a)(3).

34. If Price had known that defendants were going to enroll him in an automatic subscription program, he would not have ordered any magazines in response to the survey advertisement.

35. Within the applicable limitations period, after plaintiff Edgemon completed an online survey, defendants presented Edgemon with the opportunity to select magazines at a cost of just $2.00 per magazine (for either the magazine itself or "processing"). Edgemon selected four magazines (including *Real Simple*, a Time publication) at a total cost of $8.00, and paid that amount with her credit card by entering her credit card information. Unbeknownst to Edgemon, defendants enrolled her in a program under which the "subscriptions" would "automatically renew" each year, at a much higher price. The following year, without plaintiff Edgemon's authorization, defendants charged Edgemon's credit card $190.00—a price increase of 2,375%. Plaintiff Edgemon is informed and believes and thereon alleges that, in connection with her selection of the four magazines, the representations and disclosures made by defendants were similar in form and content to those reflected in Exhibit 17.

36. If Edgemon had known that defendants were going to enroll her in an automatic subscription program, she would not have ordered any magazines in response to the survey advertisement.

37. Plaintiffs are informed and believe and thereon allege that defendants have made the same, or similar, offers for complimentary rewards or discounted magazine subscriptions to other California consumers, in connection with which defendants have charged the consumers' credit cards, debit cards, and/or third-party payment accounts without authorization, under the guise that the magazine selections or subscriptions "automatically" renew and/or provide for continuous service until cancelled by the consumer when, in fact, the offers and subsequent charges are in violation of California law. Defendants engaged in such practices knowingly and willfully.

38. Plaintiffs allege that Time has conspired with and has aided and abetted Synapse and SynapseConnect with respect to the marketing and billing of "automatic renewal" magazine subscriptions that do not comply with California law, and in so doing, Time has acted not only as the owner of Synapse and SynapseConnect but also for its own independent benefit as the publisher of magazines that are distributed by Synapse and SynapseConnect, by reason of which Time itself directly derives both subscription revenue and advertising revenue. Time has sought to carry out indirectly through Synapse and SynapseConnect such marketing and billing practices that Time is prohibited from doing directly.

## CLASS ACTION ALLEGATIONS

39. Plaintiffs bring this lawsuit as a class action under Fed. R. Civ. Proc. 23. Plaintiffs seek to represent the following Class: "All individuals in California who, within the applicable statute of limitations, and in connection with a magazine selection or subscription through defendants obtained for personal, family, or household purposes, were enrolled by defendants in an automatic renewal program or a continuous service program. Excluded from the class are all employees of defendants, all employees of plaintiffs' counsel, and the judicial officers to whom this case is assigned."

40. Ascertainability. The members of the Class may be ascertained by reviewing records in the possession of defendants and/or third parties, including without limitation defendants' marketing and promotion records, customer records, and billing records.

41. Common Questions of Fact or Law. There are questions of fact or law that are common to the members of the class, which predominate over individual issues. Common questions regarding the class include, without limitation: (1) defendants' policies, practices and procedures for obtaining affirmative consent from customers before charging a credit card, debit card, or third-party payment account for an automatic renewal or continuous service; (2) whether defendants

presented automatic renewal offer terms or continuous service offer terms in a manner that is "clear and conspicuous" within the meaning of California law and in "visual proximity" to a request for consent to the offer (or in the case of an offer conveyed by voice, in temporal proximity to a request for consent to the offer); (3) whether defendants provide consumers with an acknowledgment that includes automatic renewal or continuous service offer terms, the cancellation policy, and information regarding how to cancel, in a manner that is capable of being retained by the consumer; (4) defendants' record-keeping practices; and (5) the appropriate remedies for defendants' conduct.

42. Numerosity. The Class is so numerous that joinder of all Class members would be impracticable. Plaintiffs are informed and believe and thereon allege that the Class consists of at least 100 members.

43. Typicality and Adequacy. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs allege on information and belief that defendants enrolled Class members in automatic renewal or continuous service offer programs without presenting applicable terms in the manner required by law, charged Class members' credit cards, debit cards, or third-party accounts without first obtaining the Class members' affirmative consent in the manner required by California law, and failed to provide the requisite acknowledgment in a manner capable of being retained by the Class members. Plaintiffs have no interests that are adverse to those of the other Class members. Plaintiffs will fairly and adequately protect the interests of the Class members.

44. Superiority. A class action is superior to other methods for resolving this controversy. Because the amount of restitution to which each Class member may be entitled is low in comparison to the expense and burden of individual litigation, it would be impracticable for Class members to redress the wrongs done to them without a class action forum. Furthermore, on information and belief, Class members do not know that their legal rights have been violated. Class certification

would also conserve judicial resources and avoid the possibility of inconsistent judgments.

45. Defendants Have Acted on Grounds Generally Applicable to the Class. Defendants have acted on grounds that are generally applicable to the Class, thereby making appropriate final injunctive relief and/or declaratory relief with respect to the class as a whole.

## FIRST CAUSE OF ACTION

False Advertising – Violation of the Automatic Renewal Law

46. Plaintiffs incorporate the allegations of paragraphs 1-45 as though set forth herein.

47. As part of California's False Advertising Law, the California Automatic Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*, became effective on December 1, 2010.

48. Cal. Bus. & Prof. Code § 17601(a) defines the term "automatic renewal" as meaning "a plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term."

49. Cal. Bus. & Prof. Code § 17601(b) defines "automatic renewal offer terms" as meaning "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancelation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) The minimum purchase obligation, if any."

50. Cal. Bus. & Prof. Code § 17601(e) defines the term "continuous service" as meaning "a plan or arrangement in which a subscription or purchasing agreement continues until the customer cancels the service."

51. Cal. Bus. & Prof. Code § 17601(c) defines the terms "clear and conspicuous" and "clearly and conspicuously'' to means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language. In the case of an audio disclosure, 'clear and conspicuous' and 'clearly and conspicuously' means in a volume and cadence sufficient to be readily audible and understandable."

52. Cal. Bus. & Prof. Code § 17602(a) makes it unlawful for any business making an automatic renewal offer or a continuous service offer to a consumer in California to do any of the following:

(1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer.

(2) Charge the consumer's credit or debit card or the consumer's account with a third party for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms.

(3) Fail to provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel

in a manner that is capable of being retained by the consumer. If the offer includes a free trial, the business shall also disclose in the acknowledgment how to cancel and allow the consumer to cancel before the consumer pays for the goods or services.

53. Cal. Bus. & Prof. Code § 17602(b) requires that the acknowledgment specified in § 17602(a)(3) include a toll-free telephone number, electronic mail address, or other mechanism for cancellation.

54. In the case of a material change in the terms of an automatic renewal or continuous service offer that has been accepted, Cal. Bus. & Prof. Code § 17602(c) makes it unlawful to fail to provide the consumer with a clear and conspicuous notice of the material change.

55. Cal. Bus. & Prof. Code § 17603 provides: "In any case in which a business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent as described in Section 17602, the goods, wares, merchandise, or products shall for all purposes be deemed an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business, including, but not limited to, bearing the cost of, or responsibility for, shipping any goods, wares, merchandise, or products to the business."

56. Plaintiffs are informed and believe and thereon allege that, during the applicable statute of limitations period, defendants have enrolled consumers, including plaintiffs and Class members, in automatic renewal programs and/or continuous service programs and have violated the California Automatic Renewal Law by, among other things, (a) failing to present automatic renewal or continuous service offer terms in a clear and conspicuous manner before a selection, subscription, or purchasing agreement is fulfilled and in visual proximity, or in the

case of an offer conveyed by voice, in temporal proximity, to a request for consent to the offer; (b) charging the consumer's credit card, debit card, or third-party payment account for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to an agreement containing clear and conspicuous disclosure of automatic renewal offer terms or continuous service offer terms; and (c) failing to provide an acknowledgment that includes automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, all in violation of Cal. Bus. & Prof. Code § 17602(a) and (b).

57. As a result of defendants' statutory violations, any automatic renewal or continuous service offers made or attempted to be made by defendants to plaintiffs and Class members were in violation of law and, therefore, such offers or attempted offers were not accepted by plaintiffs or Class members and did not give rise to an agreement for automatic renewal or continuous service. In the alternative, however, defendants would be in violation of Cal. Bus. & Prof. Code § 17602(c) by having failed to provide plaintiffs and Class members with a clear and conspicuous notice of a material change in price and information regarding how to cancel in a manner that is capable of being retained by the consumer.

58. As a result of defendants' conduct, pursuant to Cal. Bus. & Prof. Code § 17603, plaintiffs and Class members are entitled to restitution of all amounts that defendants charged or caused to be charged to plaintiffs' and Class members' credit cards, debit cards, or third-party payment accounts during the four years preceding the filing of this Complaint and continuing until defendants' statutory violations cease.

59. As a result of defendants' conduct, pursuant to Cal. Bus. & Prof. Code § 17535, plaintiffs and the Class members are entitled to an injunction enjoining defendants from making magazine selection or subscription offers that do not comply with California law, from making charges to credit cards, debit cards, or

third-party payment accounts without prior affirmative consent to an agreement containing "clear and conspicuous" disclosures of automatic renewal offer terms or continuous service offer terms, and from failing to provide an acknowledgment that includes clear and conspicuous disclosure of automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.

## SECOND CAUSE OF ACTION

Violation of the Consumers Legal Remedies Act ("CLRA")

60. Plaintiffs incorporate the allegations of paragraphs 1-45 as though set forth herein.

61. Plaintiffs and the Class members are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that plaintiffs and the Class members sought or acquired defendants' goods and/or services for personal, family, or household purposes.

62. Defendants' selection and/or subscription offers and the magazines pertaining thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b).

63. The purchases by plaintiffs and Class members are "transactions" within the meaning of Cal. Civil Code § 1761(e).

64. Defendants have violated Cal. Civil Code § 1770, subdivisions (a)(5), (a)(9), (a)(13) and (a)(17) by representing that defendants' goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised; making false and misleading statements of fact concerning the reasons for, existence of and amounts of price reductions; and by representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

65. Defendants' conduct alleged herein was undertaken by defendants knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of Cal. Civil Code § 3294(c).

66. Plaintiffs, on behalf of themselves and all other members the Class, seek an injunction prohibiting defendants from continuing their unlawful practices in violation of the Consumers Legal Remedies Act, as described above.

67. A CLRA letter pursuant to Cal. Civil Code § 1782(a) was sent to defendants that provided notice of defendants' violations of the CLRA and demanded defendants correct or otherwise rectify the practices complained of herein. Defendants failed to comply with the letter within thirty (30) days. Accordingly, pursuant to Cal. Civil Code § 1780(a)(3), plaintiffs, on behalf of themselves and all other members of the Class, seek compensatory damages, punitive damages, and restitution of any ill-gotten gains due to defendants' acts and practices.

## **THIRD CAUSE OF ACTION**

Conversion

68. Plaintiffs incorporate the previous allegations as though fully set forth herein.

69. As a result of charges made by defendants to plaintiffs' and Class members' credit cards, debit cards, and/or third-party payment accounts without authorization and in violation of California law, defendants have taken money that belongs to plaintiffs and Class members.

70. The amount of money wrongfully taken by defendants is capable of identification.

71. Defendants engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

72. As a result of defendants' actions, plaintiffs and Class members have suffered damages.

## FOURTH CAUSE OF ACTION

Violation of the California Unfair Competition Law

73. Plaintiffs incorporate the allegations of paragraphs 1-67 as though set forth herein.

74. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines unfair competition as including "any unlawful, unfair or fraudulent business act or practice."

75. In the course of conducting business within the applicable limitations period, defendants committed "unlawful," "unfair," and "fraudulent" business practices by, *inter alia* and without limitation, (a) failing to present the terms of automatic renewal or continuous service offers in a clear and conspicuous manner before a magazine selection, subscription, or purchasing agreement is fulfilled and in visual proximity, or in the case of an offer conveyed by voice, in temporal proximity, to a request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (b) charging the consumer's credit card, debit card, or third-party payment account for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to an agreement containing clear and conspicuous disclosures of automatic renewal offer terms or continuous service offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (c) failing to provide an acknowledgment that includes clear and conspicuous disclosure of automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (d) representing that defendants' goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (e) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); (f) making false and misleading statements of fact concerning the reasons for, existence of and amounts of price reductions, in violation of Cal. Civil Code §

1770(a)(13); (g) representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction, in violation of Cal. Civil Code § 1770(a)(17); and (h) converting to defendants' own use and benefit money that rightfully belongs to plaintiffs and Class members. Plaintiffs reserve the right to identify other violations of law that constitute unlawful, unfair, or fraudulent business acts or practices.

76. Defendants' acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

77. There were reasonably available alternatives to further defendants' legitimate business interests, other than the conduct described herein.

78. Defendants' acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

79. Plaintiffs have suffered injury in fact and lost money as a result of defendants' acts of unfair competition.

80. Pursuant to Cal. Bus. & Prof. Code § 17203, plaintiffs and the Class members are entitled to an order: (1) requiring defendants to make restitution to plaintiffs and the Class members; (2) enjoining defendants from charging plaintiffs' and Class members' credit cards, debit cards, and/or third party payment accounts until such time as defendants obtain the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms; and (3) enjoining defendants from making automatic renewal or continuous service offers in the State of California that do not comply with the California Automatic Renewal Law.

**FIFTH CAUSE OF ACTION**

Unjust Enrichment

81. Plaintiffs incorporate the allegations of paragraphs 1-67 and 73-80 as though fully set forth herein.

82. As a result of charges made by defendants to plaintiffs' and Class members' credit cards, debit cards, and/or third-party payment accounts in violation of California law, defendants received money at the expense of plaintiffs and Class members. Defendants would be unjustly enriched if they were permitted to retain those funds, and defendants should be ordered to restore said funds to plaintiffs and Class members.

83. Plaintiffs allege this unjust enrichment claim in the alternative to relief provided under any legal claim alleged herein.

**PRAYER**

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1. For restitution;

2. For injunctive relief as alleged herein;

3. For reasonable attorneys' fees pursuant to Cal. Civ. Code § 1780(e);

4. For compensatory damages, punitive damages, and restitution pursuant to Cal. Civil Code section 1780(a)(3);

5. For damages in an amount to be proved at trial;

6. For punitive damages;

7. For reasonable attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5;

8. For costs of suit;

9. For pre-judgment interest; and

10. For such other relief that the Court deems just and proper.

Dated: August 23, 2016 DOSTART HANNINK & COVENEY LLP

/s/ Zach P. Dostart
ZACH P. DOSTART
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all claims and causes of action so triable.

Dated: August 23, 2016 DOSTART HANNINK & COVENEY LLP

/s/ Zach P. Dostart
ZACH P. DOSTART
Attorneys for Plaintiffs

778824.2